IN THE MATTER OF THE CLOSING OF JAMESBURG HIGH SCHOOL, SCHOOL DISTRICT OF THE BOROUGH OF JAMESBURG, MIDDLESEX COUNTY.

Argued November 13, 1979—Decided July 25, 1980.

*William S. Greenberg,* argued the cause for appellants New Jersey Education Association and Jamesburg Education Association (*Greenberg & Mellk,* attorneys; *Dennis Daly,* on the briefs).

*Stephen E. Klausner,* argued the cause for appellant Monroe Township Education Association.

*Alfred E. Ramey, Jr.,* Deputy Atty. Gen., argued the cause for respondent State Board of Education (*John J. Degnan,* Atty. Gen. of New Jersey, attorney; *Erminie L. Conley,* Asst. Atty. Gen., of counsel).

*David B. Rubin,* argued the cause for respondent Jamesburg Board of Education (*Rubin, Lerner & Rubin,* attorneys).

*Bertram E. Busch,* argued the cause for respondent Board of Education of the Township of Monroe (*Busch & Busch,* attorneys).

*Philip H. Shore* argued the cause for respondent Board of Education of the Borough of Spotswood (*Golden, Shore, Zahn & Richmond,* attorneys).

*David W. Carroll,* General Counsel, argued the cause for amicus curiae The New Jersey School Boards Association (*David W. Carroll* and *Paula A. Mullaly,* on the brief).

The opinion of the Court was delivered by

CLIFFORD, J.

This case arises from an order of the Commissioner of Education, affirmed by the State Board of Education, which transferred tenured teachers previously employed at the now closed Jamesburg High School to the school districts of Monroe Township and Spotswood Borough. The issue is whether the Monroe and Spotswood districts can be required to treat the Jamesburg teachers as tenured faculty within their own systems. The Board of Education's decision answering that question in the affirmative was reversed by the Appellate Division, 169 *N.J.Super.* 328 (1979). That court held that in the absence of an agreement between the sending and receiving school districts under *N.J.S.A.* 18A:28–6.1, Monroe and Spotswood could not be compelled to accept the displaced Jamesburg instructors. We granted certification to review the effect of *N.J.S.A.* 18A:28–6.1 and the inherent power of the Commissioner of Education to order such a transfer, 81 *N.J.* 334 (1979). Pending review we stayed the Appellate Division judgment. We now dissolve the stay, modify the judgment below to provide for a limited remand, and, as modified, affirm the judgment of the Appellate Division.

I

On April 4, 1979, the State Board of Education ordered the Jamesburg Board of Education to close its only high school.

That order was issued after public hearings on the matter and pursuant to the Commissioner of Education's determination that the school could not be operated in a thorough and efficient manner. At the State Board's direction Jamesburg residents who had been enrolled as students in the school's 9th through 12th grades were designated tuition pupils at the Monroe Township High School. By an agreement authorized by the Commissioner, the Helmetta Board of Education and the Spotswood Board of Education entered into a sending-receiving arrangement under which Helmetta residents who had been tuition students at Jamesburg High School were enrolled as tuition students in the Spotswood school system.[1]

On May 1, 1979, the Commissioner found that upon the closing of Jamesburg High School, the tenured teachers employed at that facility should be transferred to the Monroe and Spotswood high schools in proportion to the number of Jamesburg students received by those districts.[2] In the opinion of the Commissioner, the transfer was authorized by *N.J.S.A.* 18A:28–6.1. Stating

---

[1] The Commissioner of Education purported to close Jamesburg High School pursuant to the authority vested in him under *N.J.S.A.* 18:7A–15; and the asserted authority for the order designating Monroe and Spotswood as the receiving districts for the Jamesburg students was *N.J.S.A.* 18A:38–8. These determinations, originating in a separate proceeding, were subsequently upheld by the Appellate Division in an unreported decision. Any implicit suggestion of the dissenters to the contrary notwithstanding, these prior determinations are not at issue here and we are not called upon to decide their propriety.

Additionally, no appellant has even cited *N.J.S.A.* 18A:7A–15, much less argued that that statute provides authority for the Commissioner's order at issue in this case. Surely the better practice for an appellate court is to eschew consideration of issues not created by the record, not raised on appeal, and not argued by the parties. *See United States Trust Co. v. State,* 69 *N.J.* 253, 257 (1976), rev'd on other grounds, 431 *U.S.* 1, 97 *S.Ct.* 1505, 52 *L.Ed.2d* 92, rehearing den., 431 *U.S.* 975, 97 *S.Ct.* 2942, 53 *L.Ed.2d* 1073 (1977); *Nieder v. Royal Indemnity Ins. Co.,* 62 *N.J.* 229, 234 (1973); see *infra* at 549.

[2] Under the State Board's order, 75% of the displaced Jamesburg students were sent to Monroe and the balance to Spotswood. In accordance with that distribution, twelve of the sixteen tenured Jamesburg teachers involved were sent to Monroe and the remaining four to Spotswood.

that only a "strained and narrow statutory interpretation" would allow the absence of an agreement between Jamesburg and Monroe and Spotswood to preclude the transfer of the tenured Jamesburg instructors, the Commissioner declared "it was implicit legislative intent to grant protection in employment rights to [tenured] teaching staff members" in such cases.

The Commissioner's order was unanimously upheld by the State Board of Education.[3] Acknowledging that no statute expressly authorized the Commissioner to order the transfer of the Jamesburg teachers, the State Board held that such action was justified by the public policy underlying education law with respect to the rights of tenured teachers. Citing other statutes concerned with employment security for tenured teachers, the State Board found they evinced a policy designed to "protect teaching staff members in their tenure, seniority and pension rights as far as practicable." *See N.J.S.A.* 18A:13–42, –49 and :28–15. Although the Board recognized that the "by agreement" language of *N.J.S.A.* 18A:28–6.1 distinguished it from statutes addressing compelled sending-receiving relationships, it found that the requirement of a sending-receiving agreement should not be interpreted to limit the application of the statute in the face of legislative concern with the rights of tenured teachers.

Applications by Monroe and Spotswood to stay the decision of the State Board were granted by the Appellate Division which, on its own motion, consolidated and accelerated the appeals. *In re Closing of Jamesburg High School*, 169 *N.J.Super.* 328 (1979). That court reversed and set aside the determinations of the Commissioner and the State Board of Education, concluding that the Commissioner lacked any authority, express or inherent, to transfer the instructors without the consent of the receiving districts. *Id.* at 333–34. Stating that "[a]dministrative officers

---

[3]The affirmance of the Commissioner's findings was subject to the modification of the State Board that if possible, qualifying teachers be afforded the right to remain in the Jamesburg school system, by filling available positions at the grade school level. *See N.J.S.A.* 18A:28–6.1.

may exercise only such authority as is conferred by statute, expressly or by unavoidable implication," *id.* at 334, the court found that *N.J.S.A.* 18A:28–6.1 did not confer such power. It noted that the words "by agreement with another board of education" had been inserted by amendment to the original draft of the statute, and ruled that in the absence of authority to the contrary, those words should be accorded their plain meaning. See *id.* at 331, 333. The Appellate Division determined that the disputed language was intended to limit the application of the statute to those situations in which the receiving district has consented to the transfer of the teachers. *Id.* at 333. To that end the court declared:

> While a school district may be compelled to become a receiving district [for displaced students], *N.J.S.A.* 18A:38–8, there is no provision in the law which compels a receiving district against its will to also accept the transfer of teachers from a school which has closed in another district. The desirability of such a provision is clearly for the legislature and not the courts to determine. [*Id.* at 333–34.]

This Court stayed the Appellate Division judgment in order to maintain the Monroe and Spotswood teaching staffs in status quo for the 1979–80 school year.

## II

Our discussion here necessarily begins with a review of the statute in question. Encaptioned "Tenure upon Discontinuance of School," *N.J.S.A.* 18A:28–6.1 provides in pertinent part:

> Whenever, heretofore or hereafter, any board of education in any school district in this state shall discontinue any high school, junior high school, elementary school or any one or more of the grades from kindergarten through grade 12 in the district and shall, *by agreement with another board of education,* send the pupils in such schools or grades to such other district, all teaching staff members who are assigned for a majority of their time in such school, grade or grades and who had tenure of office at the time such schools or grades are discontinued shall be employed by the board of education of such other district in the same or nearest equivalent position * * *. Teaching staff members so employed in such other district shall have their rights to tenure, seniority, pension and accumulated leave of absence, accorded under the laws of this State, recognized and preserved by the board of education of that district. [*N.J.S.A.* 18A:28–6.1 (emphasis added).]

Of central concern is the statute's provision that upon the discontinuation of a school, specified students and tenured

teachers from that school may be transferred "by agreement with another board of education" to another school district. In this case it is acknowledged that there was no agreement by the Monroe or Spotswood Boards of Education to accept the transfer of tenured teachers formerly employed at Jamesburg High School. Monroe and Spotswood contend that although they can be required to receive the students from Jamesburg, see *N.J. S.A.* 18A:38-8, they cannot be obligated to accept the tenured teachers without their consent. Counsel for the appellants argue that the legislative intent to protect the rights of tenured teachers, rather than the existence of an agreement, is controlling.

The Appellate Division found *N.J.S.A.* 18A:28-6.1 to be clear in its terms and operation. It held the authority to transfer tenured teachers under the statute is plainly conditioned upon a consensual relationship between the sending and receiving school districts. Absent such an agreement, a transfer may not be undertaken. We agree. The words of the statute require exactly what they say—an agreement between the concerned Boards of Education. The statement is unequivocal. Fundamental principles of statutory construction require that "[i]f the [statutory] language is plain, unambiguous and uncontrolled by other parts of the act or other acts upon the same subject the court cannot give it a different meaning." C. D. Sands, 2A *Sutherland Statutory Construction* § 46.01 (4th ed. 1973). This standard of interpretation has been consistently employed by the courts of this State. *See Fahey v. Jersey City,* 52 *N.J.* 103, 107 (1968); *Duke Power Co. v. Patten,* 20 *N.J.* 42, 49 (1955); *Imbriacco v. State Civil Service Comm'n,* 150 *N.J.Super.* 105, 109 (App.Div.1977); *In re Public Hearings on the Amended Determination of the Commuter Operating Agency for Fiscal Year 1975–1976,* 142 *N.J.Super.* 136, 158 (App.Div.), certif. den., 72 *N.J.* 457 (1976). It applies with equal force to resolve the question of construction presented in this case.

We find unpersuasive the appellants' contentions that the expressed legislative intent favoring the rights of tenured teachers should control this Court's interpretation of *N.J.S.A.* 18A:28–

6.1. The statute's design is clear: to provide employment protection to tenured educational instructors transferred *by consensual arrangement* to another school district, and to furnish the same protection to tenured teachers in the *receiving* district. However, that salutary objective cannot be secured by extending the law to situations in which it was not intended to apply. The statute's requirement of a consensual arrangement is manifest. Such a construction in no way evades the purpose of the law. *See Suter v. San Angelo Foundry & Mach. Co.*, 81 *N.J.* 150, 160 (1979); *Hasbrouck Heights Hosp. Ass'n v. Borough of Hasbrouck Heights*, 15 *N.J.* 447, 453 (1954). Rather, it recognizes the limitation on tenure protection which the legislature itself has chosen to impose. We do not perceive any intention on the part of the legislature to grant unqualified preservation of tenure rights in every instance of a school closing or formation of a sending-receiving relationship.

Our duty is to construe and apply the statute as enacted. We are not at liberty to presume the legislature intended something other than what it expressed by its plain language. This Court will not engage in conjecture or surmise which will circumvent the plain meaning of the act. *Gangemi v. Berry*, 25 *N.J.* 1, 10 (1957); *Bravand v. Neeld*, 35 *N.J.Super.* 42, 52 (App.Div.1955). Appellants' recourse lies with the legislature, not with this Court.

### III

■ Similarly without merit are the appellants' contentions that the Commissioner of Education possesses the inherent authority under *N.J.S.A.* 18A:28–6.1 to order the transfer of the tenured Jamesburg teachers to the Monroe and Spotswood School Districts. In their view the grant of jurisdiction to the Commissioner "to hear and determine * * * all controversies and disputes arising under the school laws", *N.J.S.A.* 18A:6–9, vests him with the power to fashion substantive rules pertaining to teacher tenure. Appellants claim that this jurisdiction, coupled with the demonstrated legislative concern regarding educational tenure, effectively justifies the Commissioner's action in this case. They are mistaken.

Unlike the decision to close Jamesburg High School, the Commissioner's determination to transfer the Jamesburg teachers to Monroe and Spotswood did not purport to be in any way grounded upon considerations of affording the students a thorough and efficient education. See *N.J.S.A.* 18A:7A–15; *n.* 1 *supra* at 544.[4]  At oral argument appellants conceded as much. Rather, the ruling was based on the Commissioner's interpretation of *N.J.S.A.* 18A:28–6.1.  In that regard he found that "*N.J. S.A.* 18A:28–6.1 does control in the instant matter [and that] it was the implicit legislative intent to grant protection in employment rights to teaching staff members with long and satisfactory service in such circumstances as here presented."

Assessing the Commissioner's findings we must first note that *N.J.S.A.* 18A:28–6.1 in fact does not support his action in the instant matter.  As previously illustrated, *supra* at 546–547, the statute expressly requires an agreement between the involved Boards of Education.  That prerequisite was conspicuously absent here, thus precluding sanction of the transfer under the statute.

We must reject also the notion that the Commissioner has the inherent authority under *N.J.S.A.* 18A:28–6.1 to order such a transfer.  "[A]n administrative officer is a creature of legislation who must act only within the bounds of the authority delegated to him." *Elizabeth Fed. Sav. & Loan Ass'n v. Howell,* 24 *N.J.* 488, 499 (1957).  Where there exists reasonable doubt as to whether such power is vested in the administrative body, the power is denied. *Swede v. City of Clifton,* 22 *N.J.* 303, 312 (1956).  Although the declared purpose of *N.J.S.A.* 18A:28–6.1 is to provide employment security to tenured faculty, our reading of the statute reveals no indication that this objective can be achieved other than by the means provided—namely, consensual

---

[4]The question of whether the Commissioner's action in this case might be justified under his pervasive authority to provide for thorough and efficient education was neither raised by the Commissioner nor argued by the parties. *N.J.S.A.* 18A:7A–15; *N.J.S.A.* 18A:7A–5(c), (g).  As it is beyond the scope of the appeal now before the Court, any determination of the issue would be inappropriate.

arrangement. Specifically, we fail to see any indication that the statute provides the Commissioner with the discretion to require such a result.

In holding the Commissioner was without the authority to compel the transfer in this case, the Appellate Division relied upon the decision of this Court in *Burlington Cty. Evergreen Mental Hosp. v. Cooper*, 56 *N.J.* 579 (1970). The reference is appropriate. In *Cooper*, the Court was presented with the question of whether the Public Employment Relations Law, *N.J.S.A.* 34:13A–1 *et seq.*, granted the Public Employment Relations Commission the power to proscribe certain activities as constituting unfair labor practices in violation of the Act. The Commission maintained that such authority was inherent in its broad jurisdictional grant to prevent and settle labor disputes in the public and private sectors. Rejecting the Commission's argument, the Court declared:

> Whether PERC should be invested with authority to hear and decide unfair labor practice charges and to issue various types of affirmative remedial orders respecting them is an important policy question. In our judgment, a policy question of that significance lies in the legislative domain and should be resolved there. A court should not find such authority in an agency unless the statute under consideration confers it expressly or by unavoidable implication. [56 *N.J.* at 598.] [5]

The reasoning in *Cooper* is applicable to the matter at hand. Whether the Commissioner or, for that matter, the State Board of Education can enlarge the bounds of existing protection of teachers' tenure is "an important policy question." Clearly, such power is not conferred by the express terms of *N.J.S.A.* 18A:28–6.1. Similarly, the grant of jurisdiction to the Commissioner and of supervisory power to the State Board does not by unavoidable implication vest either with the power to create substantive law governing teacher tenure. *N.J.S.A.* 18A:28–6.1 plainly does not

---

[5] It should be noted that in 1974, the Public Employment Relations Commission was granted exclusive jurisdiction over unfair labor practices. L.1974 c. 123 § 1; *see Patrolmen's Benevolent Ass'n v. Montclair*, 70 *N.J.* 130 (1976); *N.J.S.A.* 34:13A–5.4(c). The analysis employed by the *Cooper* Court, however, remains undisturbed and unimpaired. *See Board of Trustees of Mercer Cty. College v. Sypek*, 160 *N.J.Super.* 452, 462 (App.Div.), certif. den., 78 *N.J.* 327 (1978).

provide for the transfer of the tenured teachers under the facts here presented and neither the Commissioner nor the State Board possesses the inherent authority under the statute to order such action.

■ Finally, we note that the invalid order of the State Board may have caused local school boards in Monroe and Spotswood to discharge instructors in their schools to accommodate tenured employees from Jamesburg. We therefore remand the matter to the Commissioner of Education to determine whether this has occurred, and to fashion any appropriate remedy. *See N.J.S.A.* 18A:6–9. To this limited extent we modify the judgment below. We do not retain jurisdiction.

The stay is dissolved. The judgment of the Appellate Division is modified to provide for a limited remand, and, as modified, is affirmed.

SULLIVAN, J. (dissenting).

In this case, the State Board of Education (State Board) ordered the closing of the Jamesburg High School and the transfer of the students to the neighboring school districts of Monroe Township and Spotswood Borough. It also ordered the transfer of tenured teachers previously employed at the closed high school to the school districts to which the pupils were being sent. The majority opinion does not question the State Board's power to have ordered the closing of the school and the transfer of the pupils, but holds that the Board lacked the power to reassign the tenured teachers from the closed school to the school districts to which the pupils were transferred. In the main, the majority bases its ruling on an interpretation of *N.J.S.A.* 18A:28–6.1 which, it says, permits the transfer of teachers in a school closing situation only by agreement with the other school districts.

I agree that the statute so provides but in my opinion this statute has nothing to do with the State Board's order. The statute deals with a situation where a *local school district* closes a school. In such case the statute provides that the students

and teachers in the closed school may be transferred to another school district "by agreement" with that district. The statute makes sense. Obviously, a local school district should not be permitted to close one of its schools and then to transfer the pupils and teachers from the closed school to another school district except with the consent of that district.

The subject matter of this appeal is entirely different. Here, after public hearings on the question, the State Board ordered the closing of Jamesburg High School based on a determination by the Commissioner of Education that the school could not be operated in a thorough and efficient manner. There is no statute specifically providing for such an order. However, the majority notes that the closing was ordered pursuant to *N.J.S.A.* 18A:7A–15, which states that when the State Board determines that a local district is not providing a thorough and efficient education, the State Board

shall have the power to issue an administrative order specifying a remedial plan to the local board of education * * *.

I agree that this broad authorization would empower the State Board to order the closing of a particular school if it found it necessary to do so in order to provide for a thorough and efficient education. By the same token, however, the remedial plan authorized would be incomplete unless it made provision for the students and tenured teachers in the closed school.

I do not understand how the majority can, in effect, sanction a State Board order closing a local school and transferring its pupils to neighboring school districts, but hold that the agency lacks the power to do anything about the tenured teachers affected by the closing. In so holding, the majority has failed to give any consideration to the obviously relevant provisions of *N.J.S.A.* 18A:7A–15.

The majority has also declined to consider whether the broad legislative authority conferred on the State Board to provide for a thorough and efficient education could be used to justify the teacher transfer order, saying that neither the State Board nor the State Commissioner of Education attempted to justify the transfer order on this ground.

I disagree. In addition to finding legislative authorization for ordering teacher transfer in *N.J.S.A.* 18A:7A–15, it is clear to me that the pervasive authority to provide for a thorough and efficient education encompasses all facets of the educational process. The transfer of tenured teachers in a situation such as is here presented is well within the delegated authority. To deny the State Board this power will result in seniority problems and possible "bumpings" in the Jamesburg school district. On the other hand, presumably, the two districts to which the pupils have been transferred will need additional teachers because of the increased enrollment. I would reverse the judgment of the Appellate Division and reinstate the decision of the State Board.

Chief Justice WILENTZ and Justice PASHMAN join in this opinion.

WILENTZ, C. J., dissenting.

I join Justice Sullivan's dissent. The protection of teachers' tenure rights is part of the legislative effort to ensure a thorough and efficient education, a constitutionally based aspect of a clear and compelling State policy of furthering the interests of school children. *See N.J. Const.* (1947), Art. VIII, § IV, par. 1. The majority opinion ignores and subverts that policy. After today, each time the Commissioner of Education determines to close a grade or an entire school within a district and transfer the pupils to a facility in another district, tenured teachers stand to have their job security stripped from them for no good reason and through no fault of their own. *Cf. N.J.S.A.* 18A:28–9, 10 (reduction in force); 18A:28–5 (grounds for dismissal of tenured teachers limited to inefficiency, incapacity or unbecoming conduct). Concededly, the majority opinion does not prohibit a receiving district from agreeing to accept tenured teachers from a district in which the Commissioner has closed a school or a grade. Nevertheless, the practical effect of today's decision is likely to be the same. When an influx of new pupils creates

teacher positions, what local board would choose not to do its own selection, negotiation and hiring?[1]

The majority accurately recognizes the absence of express authority under *N.J.S.A.* 18A:28–6.1 for the Commissioner to compel a district that has been ordered to accept students to accept tenured teachers as well. It is indeed clear that the statute grants no such express authority. It is also clear that the statute does not prohibit the Commissioner from exercising such authority. In fact, as Justice Sullivan has aptly pointed out, the statute is simply inapplicable to the situation before us. Nor indeed does any other section of the School Law specifically address this situation.[2] The majority, however, attaches unprecedented significance to this absence in its reliance upon the Latin doctrine of *expressio unius est exclusio alterius.* This rule of construction unfortunately, "usually serves to describe a result rather than to assist in reaching it." *Reilly v. Ozzard,* 33 *N.J.* 529, 539 (1960); *see* 2 *A. Sutherland, Statutory Construction* § 47.24 at 127 (4th ed. Sands 1973).

More aptly applied, this doctrine leads to the conclusion that where the Legislature saw fit to condition only one exercise of the power to close a school (by the district) on the transfer of tenured teachers, another exercise of that same power (by the Commissioner) is therefore not so limited and the Commissioner retains the power to decide whether or not to order the transfer of tenured teachers.

I would avoid a dispute over the axiom, however, for it obscures the real question, which is "whether in a given context an express provision with respect to a portion of an area reveals

---

[1]The reasons for such a choice are economic as well as political, but are rarely educational. A newly graduated teacher enters the low end of a district's salary scale, typically at $10,000–$13,000. A tenured teacher with many years of service can reach a level of $22,000 and upwards. Accepting tenured teachers would be to a district's advantage only in the event of a drastic and widespread teacher shortage, a phenomenon virtually unknown in this part of the country since colonial times.

[2]*See* statutes cited *infra* at 557–558.

by implication a decision with respect to the remainder. The issue is one of intention. The answer resides in the common sense of the situation." *Reilly, supra,* 33 *N.J.* at 539. *See Camden v. Dicks,* 135 *N.J.Super.* 559, 561–63 (Law Div. 1975) (absence of express authorization in Faulkner Act and Civil Service Act did not prohibit city from contracting to pay retiring employees for unused sick leave); *Maywood Educ. Assoc., Inc. v. Maywood Bd. of Educ.,* 131 *N.J.Super.* 551, 554–55 (Ch. Div. 1974) (absence of express authority in Title 18A did not prohibit local board from contracting to pay employees for unused sick leave and grant of authority under *N.J.S.A.* 18A:27–4 to make local rules and set salaries was broad enough to encompass such payments); *Plumbers and Steamfitters Local No. 270 v. Woodbridge Bd. of Educ.,* 159 *N.J.Super.* 83, 87–88 (App.Div.1978) (legislative failure to provide tenure for a specific group of employees not a prohibition against local board so providing).

The real question presented by this appeal, then, is whether this Court will give effect to the Legislature's intent, or will seek a way not to do so. The majority apparently believes it is compelled to limit its evaluation of the correctness of the Commissioner's action to his erroneous reliance upon *N.J.S.A.* 18A:28–6.1. It thus justifies its refusal to achieve a result that I believe was intended by the Legislature. Also presented is the question of this Court's willingness to find power in an administrative agency to achieve that legislative intent.

### I.

Simply put, *N.J.S.A.* 18A:28–6.1 does two things: first, in conjunction with *N.J.S.A.* 18A:38–11 and –13, it prevents one district from forcing its students upon another unless the two districts agree; second, it requires every such agreement to provide for the transfer of tenured teachers.

The majority opinion has converted *N.J.S.A.* 18A:28–6.1 from a strong protection of the rights of tenured teachers into an insidious weapon against them. Nothing could be more antithetical to the policies and needs served by the institution of

tenure. In a process beginning near the turn of the century, the Legislature has created and extended the protections of tenure for teachers. L. 1909, c. 243, § 1, p. 398, as amended by L. 1934, c. 188, § 1, p. 461, L. 1935, c. 27, § 1, p. 64, supp. to L. 1903 (2d Sp. Sess.), c. 1, p. 5; L. 1909, c. 243, § 3, p. 399, as amended by L. 1935, c. 126, § 1, p. 331, supp. to L. 1903 (2d Sp. Sess.), c. 1, p. 5; R.S. 18:13–16 (1937), as amended by L. 1940, c. 43; L. 1952, c. 236, § 12; L. 1962, c. 231, § 1; R.S. (1947) 18:13–17, as amended by L. 1952, c. 236, § 13; L. 1960, c. 137, § 5; L. 1962, c. 231, § 2. The courts of this State have consistently sustained this legislative judgment. *See, e. g., Lowenstein v. Newark Bd. of Educ.,* 35 *N.J.* 94 (1961) (teacher's refusal to answer questions on Communist affiliation would not sustain dismissal on asserted grounds of "moral issue"); *but see Laba v. Board of Educ. of Newark,* 23 *N.J.* 364 (1957) (tenured teacher who invoked Fifth Amendment before Congressional Committee and refused to answer questions of local superintendent as to Communist Party membership may be discharged); [3] *Viemeister v. Board of Educ. of Prospect Park,* 5 *N.J.Super.* 215 (App.Div.1949) (rank of principal may not be reduced without charges and hearing); *Board of Educ. of Garfield v. State Board of Educ.,* 130 *N.J.L.* 388 (Sup.Ct.1943) (wrongly dismissed teacher entitled to back pay and reimbursement); *Board of Educ. of City of Trenton v. State Bd. of Educ.,* 125 *N.J.L.* 611 (Sup.Ct.1941) (salaries of tenured teachers may be reduced only for just cause as provided by statute); *Steck v. Board of Educ. of Camden,* 125 *N.J.L.* 261 (Sup.Ct.1940) (board could not reduce salaries other than after proven charges as provided by statute); *School Dist. of Wildwood v. State Bd. of Educ.,* 116 *N.J.L.* 572 (Sup.Ct.1936) (marriage not grounds to dismiss tenured female teacher); *Seidel v. Board of Educ. of Ventnor City,* 110 *N.J.L.* 31 (Sup.Ct.1932), *aff'd* 111 *N.J.L.* 240 (E. & A. 1933) (tenured teacher may not be dismissed for reasons of economy when board retains non-ten-

---

[3] *Cf. Donaldson v. Board of Educ. of City of No. Wildwood,* 65 *N.J.* 236 (1974); *Katz v. Board of Tr'ees of Gloucester College,* 125 *N.J.Super.* 248 (1973) (even non-tenured employees may not be dismissed for exercise of constitutional right).

ured teachers).[4] *See generally Dunellen Bd. of Educ. v. Dunellen Educ. Ass'n*, 64 *N.J.* 17, 28–29 (1973).

Moreover, the cases make it clear that the institution of tenure is much more than a mere labor relations device. Tenure laws were designed to protect teachers in their positions, *Downs v. Board of Educ. of Hoboken*, 13 *N.J.Misc.* 853 (Sup.Ct.1935), and by virtue of the security they engender to promote a "competent and efficient" school system, *Viemeister v. Board of Educ. of Prospect Park*, 5 *N.J.Super.* 215 (App.Div.1949). The fundamental and overriding purpose of tenure is to benefit children by furthering the constitutional and legislative goal of a thorough and efficient education. *See N.J.Const.* (1947), Art. VIII, § IV, par. 1; *N.J.S.A.* 18A:7A–2, –5, –15.

A review of those statutes which deal directly with the question of tenure rights reveals a legislative design to protect tenure rights in a multitude of situations when a school district undergoes organizational or administrative change. *See N.J. S.A.* 18A:6–31.1, 31.2 (whenever one district is divided into two or more, tenure rights preserved); *N.J.S.A.* 18A:13–42 (tenure rights preserved whenever limited purpose regional district is created, for teachers assigned to grades 7–12 in high school or junior high school of constituent districts); *N.J.S.A.* 18A:13–49 (tenure rights preserved when teachers in dissolving local districts are transferred to regional district); *N.J.S.A.* 18A:13–64 (when local district withdraws from regional district, teachers continue in positions in withdrawing district with tenure rights preserved); *N.J.S.A.* 18A:28–15 (tenure rights preserved notwithstanding change in a school district's method of government); *N.J.S.A.* 18A:28–16 (tenure rights preserved when Commissioner or State agency takes over school previously operated by local district); *N.J.S.A.* 18A:28–17 (tenure rights preserved when a local board of education undertakes operation of school previously operated by State agency); and indeed *N.J.S.A.* 18A:28–6.1 (tenure rights protected when districts voluntarily

---

4 A host of similar administrative holdings is reported in New Jersey School Law Decisions.

enter sending-receiving relationship). *See also N.J.S.A.* 18A:8–34 (tenure protected when consolidated district (predecessor of regional district) created). The totality of this scheme amounts to a pervasive pattern of tenured teachers following pupil movement, and an implicit, unmistakable legislative finding that pupils benefit from the measure of continuity such a policy affords.

More particularly, *N.J.S.A.* 18A:28–6.1 protects tenured teachers in a consensual sending-receiving relationship when, but for this statute, the sending board might well be able, by negotiating with the receiving board, to contract into nullity the rights of its tenured teachers. *Cf. Dunellen, supra,* 64 *N.J.* at 24–25 (Legislature, in adopting Employer-Employee Relations Act, *N.J.S.A.* 34:13A–1 *et seq.,* did not contemplate State or local abdication of management responsibilities for educational policies). *N.J.S.A.* 18A:28–6.1 accomplishes many objectives: in conjunction with *N.J.S.A.* 18A:38–11, –13 and –20, it prevents one local board from unilaterally imposing its costly tenured teachers upon another.[5] It also, as stated, prevents local boards from neutralizing the vested rights of the tenured teachers by agreement.

Although the Legislature clearly contemplated both voluntary and involuntary sending agreements, *see N.J.S.A.* 18A:38–8, nothing in either the language or the history of *N.J.S.A.* 18A:28–6.1 suggests the applicability of that section to a sending-receiving relationship imposed on the constituent districts by order of the Commissioner. The majority has seized upon the fact that the original version of section 6.1 did not contain the words "by agreement" to prove a deliberate legislative effort to limit tenure protections only to voluntary relationships. Yet the purpose of that amendment was to extend, not limit, tenure protection, as the statement accompanying the amended bill demonstrates:

---

[5] *N.J.S.A.* 18A:38–13 and –20 require the approval of the Commissioner before a Board withdraws from a voluntary sending-receiving relationship. *See Jenkins v. Township of Morris School Dist.,* 58 *N.J.* 483, 503 (1971).

The purpose of this bill is to protect the tenure, seniority, pension and accumulated sick leave rights of teaching staff members employed by a school district which discontinues one or more grades and sends its students to another school district.

Teachers in elementary and secondary schools which regionalize or consolidate have long been accorded this same protection by law.

In fact, the majority has failed to accord proper weight to another significant difference between the two versions. The first version provided that non-tenured teachers as well as tenured teachers were to be employed in the receiving district. The deletion of non-tenured teachers from the final version reinforces the articulated purpose of the bill: to protect tenure rights by requiring that the tenured teachers follow their students.

Given this stated objective, it is erroneous to conclude that the phrase "by agreement" in *N.J.S.A.* 18A:28–6.1 is a limitation on tenure protection. Rather, the phrase must mean that the status of tenured teachers was not to be subject to any inter-board negotiations inherent in establishing a voluntary sending-receiving relationship. The Legislature could no more have intended a sending board to lighten its payroll of tenured teachers by transferring students than it could have intended to allow a receiving board to condition its acceptance of pupils or grades on the forced disappearance of tenured teachers. The boards may, indeed must negotiate over tuition costs, lunch arrangements, transportation and facilities; but *N.J.S.A.* 18A:28–6.1 protects tenure rights from the vagaries and pressures of this process.

Nevertheless, that which the Legislature so wisely refused to allow local boards to do, even if by agreement they wish to do so, a majority of this Court is prepared to force the Commissioner to do. Two resultant evils are immediately suggested. First, in any future case where for educational reasons the Commissioner must consider whether to close a school, his decision will necessarily be affected by the specter of unemployed teachers whose conscientious performance has earned them worthless

tenure rights.[6] Second, it is not unforeseeable that the potential loss of tenure when a Commissioner closes a grade or a school may be perceived as a weapon against individual districts or indeed groups of teachers. The compelling ideal of a thorough and efficient school system, *see Robinson v. Cahill*, 62 *N.J.* 473 (1973), *cert.* den. 414 *U.S.* 976, 94 *S.Ct.* 292, 38 *L.Ed.2d* 219 (1973), would be ill-served by such a draconian limitation upon the Commissioner's power to reach educational decisions.

In *Jenkins v. Township of Morris School Dist.*, 58 *N.J.* 483 (1971), this Court found that the Commissioner had sufficiently broad powers under the Constitution and the then-existing [7] statutes to direct a merger of school districts when they were unlikely to merge voluntarily under *N.J.S.A.* 18A:13–34. *See* 58 *N.J.* at 508. The Commissioner then ordered the merger and directed that the costs of the newly formed district be allocated among the component districts by valuations, as opposed to by enrollment. *See Morris Twp. Committee v. Board of Educ. of Morris Twp.*, 60 *N.J.* 186, 188–89 (1972) (*per curiam* ). One of the districts attacked that part of the Commissioner's order, arguing that under *N.J.S.A.* 18A:13–34 only the voters of the component districts could determine how to allocate costs. 60 *N.J.* at 190. This Court held that the referendum provisions of *N.J.S.A.* 18A:13–34 applied only to voluntary mergers and had no application whatever to a merger directed by the Commissioner. If the statute had been held applicable, the Court observed, the Commissioner would have been disabled from taking an effective step toward fulfilling the State's policy. *Id.* at 191.

The statutory scheme then in effect included *N.J.S.A.* 18A:4–23, which authorized the Commissioner to supervise all schools and to enforce the rules of the State Board, and *N.J.S.A.*

---

[6]Even if the teachers directly affected are certified to teach other grades, they may "bump" other tenured teachers by reason of seniority.

[7]The Public School Education Act, *N.J.S.A.* 18A:7A–1 *et seq.*, which to some extent codifies the principles of a thorough and efficient education, was enacted in 1975 in reaction to the *Robinson* cases.

18A:4–24, which authorized him to inquire into the thorough and efficient operation of any school or district. *See generally Booker v. Board of Educ. of Plainfield,* 45 *N.J.* 161, 180 (1965) (Commissioner had authority to require broad "reasonable plan" for entire Plainfield district consistent with sound educational values and procedures).

More recently, the Legislature has emphatically declared that it is the policy of this State to provide every child between 5 and 18 years of age a thorough and efficient education, monitored and corrected when necessary to realize that goal, *N.J.S.A.* 18A:7A–2. To this end, *N.J.S.A.* 18A:7A–15 empowers the Commissioner to recommend, and the State Board to implement, any appropriate and necessary changes to correct perceived deficiencies in a school district. *See generally Robinson v. Cahill,* 69 *N.J.* 449 (1976).

Thus, to the extent that a gap in the tenure protections of the School Law is perceived, it is filled not only by the policy considerations which underlie the statutes cited *supra* at 557–558, but also by the Commissioner's powers under that law and under the Public School Education Act of 1975, *N.J.S.A.* 18A:7A–1 *et seq.* The Commissioner's mistaken reliance on an inapposite section, *N.J.S.A.* 18A:28–6.1, should not, in view of the public interest at stake here, deter this Court from reaching a correct result. *Cf. Jenkins, supra,* 58 *N.J.* at 500–01, 508 (Commissioner mistakenly determined that he lacked power to direct a merger).[8]

## II.

I also take issue with the majority's reliance on *Burlington Cty. Evergreen Mental Hosp. v. Cooper,* 56 *N.J.* 579 (1970). In

---

[8]Because the question is not before the Court, I do not find it necessary to consider whether under this analysis, the Commissioner invariably must order tenured teachers transferred when he directs the formation of a sending-receiving relationship.

that case the Court refused to imply into the Public Employee Relations Law the power for the Public Employment Relations Commission to define unfair labor practices. Not only had the Legislature not made such a grant, but an overpowering legislative history shows that the Legislature had rejected the opportunity to do so. 56 *N.J.* at 594–96. A contemporary bill enumerating unfair labor practices never left committee. *Id.* at 596. A legislative report surveyed comparable statutes of 13 different states which dealt with unfair labor practices. *Id.* at 595. The legislators were also aware of the significantly broader scope of the comparable federal act. *Id.* at 594–95.

The totality of the history before the *Burlington Hospital* Court reveals not only the impossibility of judicial implication of power in that case, but the crucial distinction between it and the case before us today. The inclusion of labor practices in the jurisdiction of PERC represented a far-reaching extension into a broad and hitherto unlegislated area.

The school law and its tenure provisions, however, deal both in general concept and in detail with a multitude of related issues. The issue decided today represents merely a small gap in this overall scheme of tenure protection. The question is how best to fill that gap, not whether to fill it at all. Such interstitial lawmaking has always been within the scope of delegated authority to administrative agencies.

I would reverse the Appellate Division and reinstate the decision of the State Board.

Justice PASHMAN joins in this opinion.

*For modification and affirmance* —Justices CLIFFORD, SCHREIBER, HANDLER and POLLOCK—4.

*For reversal* —Chief Justice WILENTZ, Justices SULLIVAN and PASHMAN—3.